Case No. 20-1503, Sierra Club, Petitioner v. United States Department of Energy Ms. Naismith for the Petitioner, Mr. Smeltzer for the Respondent, Mr. Nelson for the Interpreter Good morning. Good morning, Your Honors. May it please the Court, Meneen Naismith for Petitioners, I reserve five minutes for rebuttal. The question before the Court today is narrow. Once DOE decided to conduct additional analysis on rehearing, did DOE carry out that analysis arbitrarily and did it sufficiently explain its new conclusions? I'd like to focus primarily today on the problems that arise from DOE's failure to clearly explain what conclusion it reached as to the project's climate harms, how those harms factored into its decision to approve the exports, as well as DOE's uneven handling of harms and benefits. In order to assess potential climate harms, DOE conducted a study that held multiple variables constant and focused primarily on the effect that market substitution would have on possible climate harms. At one end of the spectrum, DOE assumed that all of the gas exported from Alaska LNG would substitute for gas that would have otherwise been produced in the lower 48 states. On the other end of the spectrum, DOE assumed that all of the gas produced by Alaska LNG would be additive to global LNG markets. Based on those two extremes, DOE calculated two equally extreme amounts of potential greenhouse gas emissions that could result from the project, and at the same time, however, concluded that neither extreme was likely to actually occur. DOE, however, did nothing to try to narrow that gap. It concluded in Order 3643C that, on the one hand, the uncertainty was too great to allow it to reach a definitive conclusion as to climate harms. But then in the following sentence, a sentence that has no analysis, no citation to the record, no explanation, it concluded that in DOE's judgment, the substitution value was likely closer to the perfect substitution end of the spectrum and, therefore, that climate harms would not be as bad as at the other extreme. Ms. Naismith, what is DOE supposed to do if it concludes, we're quite confident that there will be economic benefits. We're just not sure whether there will be environmental harms. It's highly speculative. Your Honor, the problem here is that they didn't, is that the uncertainty as to the extent and the nature of those economic benefits exists equally with respect to the substitution problem on each side, and DOE didn't acknowledge that. The record before this Court is that those economic benefits were assessed based not on uncertainty and not on a recognition that, well, we think there are going to be economic benefits, but we don't know how much. This record before the Court today has several values ascribed to not an uncertain range of potential substitution, but, in fact, a very definitive point, a very definitive point that was done by the NERA study of 33 points. Let's get to the NERA study in a second, but I'm just wondering, say it's not this case, but in a hypothetical case, if DOE and its expertise concludes that there will almost certainly be significant economic benefits and it concludes that there may not be significant environmental harms because the environmental harms are quite speculative, what's DOE supposed to do in that situation? So, in that situation, again, Your Honor, that's not the record that is before this Court because what they would have to do is if the uncertainty that exists as to the harms also exists as to the benefits, they'd have to grapple with that, and they'd have to come out. They might come out the other side saying, we're not really sure what the net GDP effect of this is going to be. We're not really sure whether we're just shifting jobs from Louisiana and Texas to Alaska. If you're still fighting the hypothetical a little bit, I mean, I get that they would have to grapple with it and explain, but it seems, especially with the Natural Gas Act's presumption in favor of gas, that if there are going to be economic benefits and if it's merely speculative whether there will be environmental harms, that DOE in that situation at least may authorize the export. Is that fair? Again, if the record truly grappled with the issues that did not occur. If it's reasonably explained. If it is reasonably explained. Okay. And now let me go to where I think you want to go, which is the NERA economic data. Yes. And I see how that makes the environmental harms. I see that if you don't trust that data, it makes the environmental harms highly speculative. There's this wide range. Maybe it's going to drastically increase greenhouse gases. Maybe it's going to actually improve the greenhouse gas situation. Those are the two extremes. But I don't see how the NERA data makes the economic benefit equally speculative or speculative at all, at least in terms of whether there will be significant economic data. And here's why, and then you can tell me why you think I'm wrong. If we don't know the foreign market substitution effect, if that foreign market substitution effect is highly speculative, it seems like there's still going to be significant economic benefits, whether it's a large effect or a small effect. Because if the foreign market substitution effect is high, then it's going to mean a lot more domestic gas, which will drive down gas prices for Americans. That's a significant economic benefit. And if the foreign market substitution is low, then it means we're going to have a lot more exports. And that itself, trade balance and security for our allies, is a significant benefit. So the NERA data doesn't cast doubt on whether there will be significant economic benefit. It's going to be a benefit either way. It does cast doubt if, to the extent it's speculative and we can't rely on it, that would cast doubt on whether we can know whether the environmental effects will be significant or not. Because if the NERA data is unreliable, then we've got this wild range and we're not sure exactly where we should be. So a few responses to that to unpack some of what Your Honor just said. So first of all, the extent of substitution that DOE looked at here was the extent to which gas from the lower 48 states would substitute for gas from Alaska LNG. And while it is possible that gas from other parts of the world could substitute, the specific climate numbers that DOE came up with here were predicated on not is the gas going to come from Qatar, but is the gas going to come from Louisiana or Texas. The numbers that they came up with, the analysis they chose to do here, what we have in the record, is there is a climate benefit to not having to schlep gas from Louisiana and Texas all the way to Asia. So we have to take that as the given here, even though there are other potential uncertainties that weren't really referenced as the centerpiece of this climate analysis that DOE opted to do. So when we are looking at that substitution effect, there is a potential for a pretty different economic benefits picture depending on where you are in the extent of the substitution. Because there is not necessarily any net benefit to GDP if the gas would have been produced anyway. There is not necessarily any net job creation if the gas would have been produced anyway. And the economic picture DOE would have had to grapple with in its order, not to say there is no benefit at all, but the picture is very different. And at that point, DOE is essentially picking and choosing amongst regional winners and losers. I guess I take it that DOE was using the lower 48 as a proxy for the foreign market substitution. But I don't understand how, if the end result is a lot more gas in the United States, not leaving the United States, it just seems like if supply is greatly increased, then prices are going to go down. That's not actually necessarily true, Your Honor. And this starts to get beyond what's in the record. But actually greater exports have been shown to drastically increase consumer prices at home. I want to ask you, if I may, about the idea that environmental harm is speculative. And let me just see whether you agree with this. I'm getting these numbers from the Undersecretary of Energy in charge of science during the Obama administration, that the Earth's atmosphere consists mainly of nitrogen and oxygen. You agree with that, right? That makes up 99% of the Earth's atmosphere. The rest of 1% is mostly argon, which is inert gas. Among the remainder, the largest greenhouse gas is water vapor. And that leaves 0.00014 carbon dioxide, which is what you're worried about. And we're talking about the entire world, not just a port in Alaska. So how can it ‑‑ I mean, it seems to me absolutely impossible, if those numbers are correct, and they are, I think they are, that any kind of a burning of the gas coming out of Prudhoe Bay is going to have even the slightest wrinkle of an effect on global climate. Where is Mr. Koonin, the Undersecretary, wrong about that? Well, Your Honor, I can't speak to the specific data you gave in terms of the harm. But you talk about harm. What is the harm? So the harm is that, first, that global warming and climate change is a quintessential collective action problem. It is not the case that any one actor by themselves is ever going to be responsible for either tipping the balance one way or the other in terms of causing all of climate change or solving all of climate change. But what we have to do to solve climate change, what every climate scientist with adequate credentials has said we have to do, is to stop ‑‑ Mr. Koonin is a professor at Caltech now. He also is the head of three or four of the most prestigious scientific organizations on the planet. Is he a credible scientist? Because he doesn't agree with what you just said. Your Honor, I can't speak to the credibility of one person. I can say that the vast ‑‑ He has 300 peer review papers. Is that enough? I can't answer that question, Your Honor. I'm sorry. But the vast, vast amount of climate opinions with respect to what we have to do to address the calamity that is climate change is to stop emitting carbon dioxide and methane. And this project would be responsible for millions of tons of carbon dioxide as well as methane leakage. I understand. And you're representing, among other groups, Sierra Club, even though you're Earth Justice. Is that ‑‑ okay. So I understand that a Sierra Club goal is to reduce greenhouse gases. And I understand. Let's assume, for the sake of argument, that by prevailing in this suit, you would succeed in reducing greenhouse gases and therefore further your organization's ‑‑ one of your organization's missions. It seems like the Natural Gas Act is an odd vehicle to do that because Sierra Club wants no expansion of natural gas. They want no additional exports of natural gas. And it's all over their website. Just to give one quote, Sierra Club is working across communities to stop the expansion of the oil and gas industry. You can click a link. It will write your member of Congress and tell them how terrible it is that natural gas is being exported. But the statute that you've chosen as your vehicle to challenge this project is a statute that presumes export of natural gas. Our court has said it creates a presumption in favor of exports. So it just seems like, you know, if you were doing a Clean Air Act suit, I get how that may or may not be a good vehicle depending on a particular case. But it just seems like in almost every case and maybe every case about exports, if your goal is to just not have exports, the NGA is a really odd vehicle to try to accomplish that. Your Honor, the Natural Gas Act does not say that all exports should be approved. It gives DOE responsibility for exercising ‑‑ But it does assume that some will be approved. Yes. And you don't want any approved. At this point, Your Honor, DOE has never said no to any exports. It would be what we are seeking in this case is for DOE to comply with the Administrative Procedures Act, the National Environmental Policy Act, and the Natural Gas Act to provide a coherent record and explain the basis of its decision. And it has not done that here. And, Ms. Naismith, I'm not blaming you for this, what I view as sort of tension between the NGA as a vehicle and the goal of the ‑‑ of the suit. But I do wonder, what would it take for an export of natural gas project to be legal under the NGA, according to you? We could start with an accurate and clear underlying record in which DOE adequately assessed the harms on the one side and the benefits of the other. And has that ever happened in the past 10 years, 15 years? I can't speak to every single record that's out there, Your Honor. Can you point to a single, under the Obama, Trump, Biden administrations, can you point to a single natural gas export project that you think was legal under the NGA? Again, Your Honor, there are too many for me to be able to answer that question. I can say in this case that that underlying analysis and explanation of what was ‑‑ what did DOE look at? Did it, in fact, look at the underlying ‑‑ look at the underlying data and record in an arbitrary fashion? Here again, you have an order that says on the one hand, here are two extremes. We don't think either extreme is right. We're not going to bother to try to get to a number that's right. We're going to say on the one hand that there's uncertainty, so we can't come to a conclusion. But then in the next sentence, we're going to say, oh, but in our judgment, we think it's closer to the perfect substitution side of the spectrum, which leaves anyone in the public, no matter what their aim, completely unclear as to what this decision really was and how DOE got there. And irrespective of what ‑‑ What DOE says on the point you were just raising is that there is a fairly extensive analysis of market factors and reasons why LNG might cause substitution or not in the target export countries, and they call that their qualitative analysis. What's your response to that? The response to that is, Your Honor, that most of that's in the brief. It's not actually in the underlying order. No, I think there's about five pages of it in the SEIS about market conditions in Japan, China, et cetera, et cetera. Yes, but the SEIS does not come to the same conclusion or come even close to the same conclusion as in the order. The SEIS expressly does not say what the order says, which is we think it's closer to one side versus the other, and that it's telling because the order doesn't cite back to the SEIS at all in drawing that conclusion. And the attempts to explain this, that conclusion in the order, at least in the briefs, is also telling in that it points to a whole bunch of things, including, for example, the policy statement on export authorization extensions that the brief tries to use as a basis for bolstering that conclusion, that in fact the order 3643D says, Well, no, that policy statement is not relevant here. So there isn't a clear explanation of, again, trying to say, This is extreme. We don't think either end of the spectrum is correct. Let's try to narrow it down. And if they do truly think that it's closer to the end of the perfect substitution, then explain that. Say that clearly in the order, and then explain why, and then to go to the, I realize I'm very much over time, but to go to then the imbalance problem, is if that's the side of the spectrum that DOE thinks we're on, that's not the side of the spectrum that the benefits analysis was done on. The side of the spectrum the benefits analysis was done on was the other end of the spectrum, where lower, where there would be much higher climate harms than what DOE seems to be thinking is likely here. So you have this incredibly unbalanced muddled record, which fundamentally leads to the inability of the public or anyone else, with an inability to know, Well, is DOE thinking that we're closer to one end than the other, and that's what's really going on here? Or are they just okay with a decision that where the climate harms could be anything, and they're not going to do anything to try to narrow that gap? If the uncertainty was truly that great, and to go back to Judge Walker, some of what you were raising earlier, what should have happened here is for them to say that without this guessing game of, Well, we think it's closer to one side or the other, to say it's too uncertain. We would disagree with that. But if that would be where DOE sits, they could have then also then said, Okay, so we're now disavowing the NERO study. We don't think that was accurate for reasons that, again, are not particularly clear in the order and are much more present in the post hoc rationalizations of the brief. But to say then, for both sides of the equation, it's too uncertain. So this project could have incredibly high climate harms in a world of additive, but also actually higher economic benefits than what the NERO study even contemplated. What if I think it's reasonable that the agency concluded that the NERO data is too outdated to be useful? I can see how that, just for the sake of argument, would undermine the economic analysis that they did in the original decision. But that part of the decision, I think, is not before us, wasn't challenged on rehearing by you, isn't something that we can really address here. It is, Your Honor, for the simple reason that at the time the original rehearing request was filed, we didn't have the benefit of any analysis on the harm side. DOE is the one that opened the door to say, Well, everything is so uncertain because of market substitution. That line of reasoning was not in the record at the time the original rehearing request was filed. And therefore, Sierra Club and anyone else could not have been in a position to say, Well, wait a second, you're not treating the entire record consistently. If DOE had simply said, for example, We're going to use the NERO numbers. We're going to be consistent. We're going to use that number. And here is our climate harms. This would be a completely different case. But they opened the door by how they went about doing the climate harm analysis. Thank you very much. We'll give you time on rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. John Smeltzer for the Department of Energy. Your Honors, the Department of Energy took a hard look at all of the environmental impacts in this case, including climate impacts. And they reasonably concluded, based on that hard look, that the environmental impacts did not overcome project benefits and did not outweigh or overcome the presumption in favor of exports. And we think those judgments are entitled to this Court's deference. Did the original economic decision, economic benefits analysis, depend on the NERA data? The NERA data was cited as part of the presentation by the project proponent. The analysis wasn't disputed, and so it was part of the analysis. Is there an argument that its use, even if it was in hindsight erroneous, was harmless error? Erroneous use in what context, Your Honor? Well, imagine that because the NERA data is now so outdated, it doesn't actually inform anything useful. Is there an argument that, well, because it's outdated, perhaps it should not have been in the economic analysis, but it wasn't material even before it was outdated, and so any use was harmless? I think that's a fair way to look at it, Your Honor. I mean, ultimately, the economic determination of economic benefits was not disputed, and what the NERA model showed in general was that there would be an overall net increase in U.S. LNG exports, that Alaska exports wouldn't totally displace exports from the lower 48 states. DOE did not put a precise number on economic benefits, just like with respect to climate impacts. They just made a general determination that there would likely be not a complete displacement, but overall net economic benefits. So I think the NERA model is not disputed. I think Sierra Club essentially agrees that the likelihood is that there would be net increase in exports, and so it was perfectly usable and not disputed for what it was presented for. The key problem with the NERA model for purposes of market substitution is it doesn't address market substitution at all, right? The NERA model addresses the U.S. domestic market and domestic exports. You can model those sorts of things based on certain data that can be valid for purposes of trying to assess the export market and export demand, but the NERA model doesn't go and determine, you know, what is going to happen in the target export markets, what's going to happen in Japan or China or India or South Korea if they import LNG from Alaska. You know, what fuels are they not going to use? Is it going to displace coal? Is it going to displace other LNG? Is it going to displace renewables? All of those determinations in the foreign export markets, right, are going to depend on market conditions in those markets. It's going to depend on technologies, and it's going to depend on economic and environmental policy in those nations, right? Each of those nations is going to determine for itself, you know, how their future economy is going to develop, and those are inherently difficult to predict, right? The NERA data doesn't inform that. The NERA data doesn't look at the market substitution in the foreign markets. It just looks at export demand, right? Is there anywhere in the record that we could look to where DOE said the things that you just said? Well, the NERA model is in the record, right? Correct. And it's cited in our brief, and it's in the Joint Appendix, so you can look at it. DOE, when they were proffered the NERA model, they said that the overall data is out of date, and they also said that it didn't meet the burden, right? It didn't improve the problem, right? DOE defined the problem as needing data on market substitution in foreign markets. You can look at the model. It doesn't have that, and DOE specifically said when it was proffered that it didn't arise to the level. It didn't make this more accurate. It didn't solve the problem of the inherent uncertainty of modeling these sorts of things, right? So I suppose what they would say in response is the one specific thing in the final rehearing denial is that it's outdated, it's based on a time when the LNG market was far less developed, and so we can't basically rely on it for the extent of the economic benefits. And at the same time, when we have the section of the order describing the economic benefits, the only underlying data for that comes from the NERA study. So what, again, what's the explanation of why that's not consistent? The economic data wasn't disputed, the idea that there are benefits, and it's not disputed that there's likely to be an overall increase in U.S. LNG exports. The NERA model just gives you a number as to what the projection is going to be. I appreciate that, and I guess the concern is that when, at the end of the order, the DOE says we weighed the acknowledged but uncertain climate impacts against the economic benefits and find that this doesn't outweigh this. And now you're telling me they really didn't have in their head anything about the magnitude of the benefits. Why is that? They specifically say in the rehearing order that there are uncertainties on both sides, and they didn't put definite numbers on the economic benefits either. What I think they were getting at is sort of what Judge Walker was discussing, that the uncertainties about substitution effects create much more uncertainties than the uncertainties in relation to economic benefits. What DOE did when it weighed benefits and harms was to assume in both cases that the project would be built and that all of the exports would happen. And then in that context, you're going to get the benefits of trade, you're going to get the economic benefits. What you don't know necessarily is the climate impacts because you don't know whether the fuel is going to India to replace coal or to Korea to replace LNG from some other market or to replace renewables. But DOE made a considered judgment. Ultimately, they didn't just rest on their two numerical models, the models of all the emissions, the greenhouse gas emissions, that would cause from the entirety of the project, which they looked at in several ways. They didn't stop there. They didn't stop with the comparison. The comparison helped inform their analysis, of course, by showing that, and it goes to the point of economic benefits, if there's no increase in overall U.S. LNG exports and only displacement, you still have a benefit in terms of climate impacts because it's undisputed in that context that the lower carbon footprint because of the way natural gas is produced in Alaska and the shorter transportation distance. So that still all supports the overall balancing of the analysis. Can I also just ask you to directly respond to one of their other major arguments, which is essentially that there's a key finding that we think the climate impacts are likely to be closer to the best-case scenario than the worst-case scenario. I'm paraphrasing. But they say the reason, the rationale for saying it's likely to be closer to the one no-action alternative is unexplained. What would you offer in response to that? Well, I'd say that the analysis is in the record, and it's in the part of the record that Your Honor already pointed to. It's in the lifecycle analysis in the qualitative discussion of markets, and there is an extensive discussion in the record from Joint Appendix 992 to 1000 where it talks about each of the import countries and what their challenges are and the overall goal of net zero by 2050 and the role that increased natural gas exports can help play in even meeting that target. So there's a lot of analysis that shows that there will be a continuing demand for LNG exports, and there is also in the record in that same place and then also with respect to the policy change in the Federal Register about the export authorization overhang. There's indication that the U.S. markets, there's lots of supply either from the lower 48, and in the economic analysis, in the lifecycle analysis, they talk about other exporting countries also ramping up supply. So there's reasons to believe that there would be a substitution effect with respect to LNG. And what DOE said qualitatively, though, ultimately, is they don't think it's going to be a one-to-one. They said it's probably going to substitute, especially over the long term, for a mix of fuels, including renewables and conservation efforts. But what they said is in the near to the medium term, it's most likely to be closer to. But they also said it's most likely to be net negative. They didn't put the rosiest picture on this. The project was originally proposed as a project that would provide net benefits by the proponent because it's going to displace coal. DOE didn't make the finding that it would necessarily do that. I mean, there's obviously the opportunity to do that in certain markets. But DOE ultimately, in their qualitative judgment, agreed that it's likely to be net negative. What DOED ultimately determined, though, right, is it was too speculative to determine these things numerically for part of numeric modeling. And this issue has already been addressed by this court. In the Freeport case, which is in the Federal Register, 867 of F3, 189, this court looked specifically at this question of modeling of market substitution effects in foreign markets. And this court looked at it in two places in that ruling, pages 198 through 199 at page 202. And on page 202, this court specifically responded to the argument that DOE had failed in that case to look at the replacement of renewables or market substitution effects with respect to renewables in foreign markets. And this court specifically affirmed DOE's judgment that it wouldn't, by trying to model those impacts, it didn't have the data that would make that sufficiently reliable. And you affirmed DOE's judgment in that regard. I think there's an argument that it was fine for you to rely on the economic conclusion that you reached before the supplemental environmental impact statement. But assume for the sake of this question that you should have reweighed the economic benefits after you conducted the supplemental environmental impact statement. Is it the case that Sierra Club didn't ask the Department of Energy to reweigh the economic benefits after conducting the supplemental environmental impact statement? Well, I think their argument, Your Honor, is that we put a thumb on the scale, right, that we didn't look at the benefits in the same, the benefits and the harms in the same way and looked at the uncertainties differently. But they never asked you to reweigh the analysis for the economic benefits? No. What they asked is that we go back and use some sort of modeling for, to do some sort of market substitution modeling for purposes of the climate change analysis. Right. Any questions? No. Thank you. Thank you.  May it please the Court, my name is Howard Nelson. I represent Intervena Alaska Gas Line Development Corporation, which is a public corporation of the state of Alaska. Now, petitioners say that uncertainty of harms and benefits exists equally. Well, these benefits are, these uncertainties that they discuss in their brief are not the same. The uncertainties with respect to harm stem from this issue of substitutability of fuel and displacement. And they say, well, they should have, DOE should have narrowed it down, the specific quantification. Well, that's what the Court and Sierra Club, I call it Sierra Club Flex, that's what they said DOE cannot do because it's infeasible and impractical and speculative. Now, on the other hand, the benefits, most of the benefits, have nothing to do with the uncertainty of displacement or substitutability. The benefits in terms of regional benefits, employment opportunities, income, increased tax base, security to our nation and to our allies, they have nothing to do with displacement. Those could be quantified, and that's what was done. It seems like the strongest argument for them would be on the saying GDP will increase. That is based on ideas about substitution, right? In part, but the GDP also increases, I think. I mean, you have a lot of economic activity that's ongoing as a result of the construction and operation of these facilities. It's a huge benefit to the economy of Alaska. Now, the uncertainty of benefits, their argument is that because there's uncertainty about market need for the project and therefore uncertainty about whether the project will be built, that's a different uncertainty. Now, that argument, we believe, conflates and confuses DOE's obligations under the NGA and under NEPA. Under Section 3 of the NGA, DOE is obligated to weigh the benefits and burdens of their export authorization if the project is built. Any uncertainty that results from, you know, whether there's market need for the project or whether it will be built is simply not a consideration for DOE under the Natural Gas Act. If the project is not built, there won't be any burdens or benefits. And so, with respect to the uncertainty created by market need, that is an obligation. Well, DOE's examination of harm resulting if the project is not built, that stems from the obligation under a duty to examine no action alternative under NEPA. And under NEPA, there is no obligation to examine benefits at all or to weigh those benefits against harm. So, under whichever way you look at it, there's really no balancing and uneven application that has to be done. Counsel, your brief has a discussion of the impacts of a vacant or order from this court. Are you able to tell us anything about the current status of the project? Yes. There have been and there continue to be ongoing discussions with investors to try to get investment for the project and also with off-take customers. And so, if we get into the issue of a vacator, if this authorization were to be vacated, that would be an extreme obstacle to this project. Investors are not going to put up $45 million, you know, and risk their capital if there's uncertainty with respect to this project. Wouldn't there still be uncertainty even if we remanded without a vacator? Certainly. There would be uncertainty, but there would be a lot more uncertainty if there was a vacator. Thank you, Mr. Nelson. Thank you. I think Ms. Naismith asked for five minutes, so we'll give her the five minutes. Thank you, Your Honor. I appreciate it. I wanted to just start by clarifying a few things with respect to the NERA data, which the Department, in one place, does say is outdated. But one of the points that we made is if it's so outdated, then why not update it? Again, the problem with what DOE did here is to calculate these two very extreme values and then claim it could do nothing to reduce the uncertainty. If the problem is simply that the numbers are off and need to be updated, then update it. What counsels for DOE went through in terms of what the NERA study doesn't do is, again, not actually in the record and not what the climate harm assessment that DOE did did either. That climate study looked at solely putting aside the quantitative data that Judge Garcia referenced in the SEIS. If you look at the actual where did we get these two numbers on climate, it does not look at what's going on in foreign markets. It looks at solely the extent to which displacement would occur as between Alaska and the lower 48 states. The SEIS quantitative data- The harm that you're talking about is not a harm to any of your members, is it? It is, Your Honor. You don't rely on that harm for standing purposes, do you? We rely on a variety of different harms, Your Honor. One of them is the effect on the beluga whales in Cook Inlet, right? Yes. But if your members are interested in assessing that, all they have to do is look at the environmental impact statement that accompanied FERC's authorization because it's there in droves, right? Why do they need two environmental impact statements dealing with the same thing? Well, they don't, Your Honor, and DOE here agreed, and it is not a dispute, that an additional analysis needed to be done because FERC's analysis is limited by FERC's authority under the Natural Gas Act to look at the effects of the terminal and the associated infrastructure. So FERC's analysis looked at the terminal and the pipeline that would connect the terminal up to the North Slope. It did not look at the upstream effects, which we also based our standing claims on. But it did look at the downstream effects. It did look at the increased shipping. It looked at some of the increased shipping, Your Honor, but it did not look at the full extent of the downstream impacts. And that's why DOE concluded that it needed to do, and no one disputed, that DOE needed to do a supplemental analysis. The problem with dealing with the climate change as a harm for your members is that it's not imminent. No matter how you cut it, whatever would happen is 100 years away or 50 years away, correct? So you can't rely on that for standing, right? Your Honor, our standing affidavits rely on concrete particularized injuries, including what will occur if the project goes forward and is both constructed and put into operation. To turn quickly, though, to the point, Judge Garcia, you were making about the analysis that was in the supplemental impact statement, environmental impact statement, that is this discussion of foreign markets. That discussion ranges through a wide set of factors and talks about how many things could point in different directions. It does not reach a conclusion. It does not say, and we think as a result of all of this quantitative discussion, where we fall in the spectrum of the two numbers that were put forth in the climate harm assessment. That conclusion is only in the order and, again, does not refer back. DOE could have said, let us go back and point to the SEIS and pick out all of these things. It didn't. It also didn't include things that counsel raised in briefing and, again, today about the findings of the overhang in the policy statement. As I mentioned earlier, DOE expressly said that's not relevant here when it was raised by petitioners in other contexts. Very quickly, the finding also in Sierra Club v. DOE being dispositive here in terms of the uncertainty being a reason to just not do anything. That, in that case, is distinguishable, and we make this point in our brief as to the fact that what was being disputed there is that DOE didn't include one variable, specifically whether or not renewables were being considered downstream. It did not challenge the entire approach that DOE took in that instance, which is what we are doing here. With respect to the economic... You're coming close. My final point, with respect to the economic benefits, again, it is not in dispute that there would be some economic benefits. The question is, is the economic benefits that were referred to in the order and relied upon by DOE accurate? There may be benefits to the state of Alaska, but if we are dealing with 100% substitution, those benefits, therefore, are coming from somewhere else. They're net neutral, and, therefore, what DOE should, under its standard of not simply having to say what's good for Alaska, but rather what is good for the entire U.S. public, grapple with the fact that jobs are moving from one part of the country to another. We, therefore, ask this panel to remand and vacate. Thank you very much. Thank you for your eloquent argument.
judges: Walker; Garcia; Randolph